No. 57,098

First National Bank, *Appellee*, v. Adrian Milford, *et al.*, *Appellant*.

No. 57,518

Patrick Milford, *Appellant*, v. First National Bank, *Appellee*.

(718 P.2d 1291)

Opinion filed May 2, 1986.

*David L. Patton*, of Patton & Kerbs, of Dodge City, argued the cause, and *Timothy J. Grillot*, of the same firm, was with him on the brief for appellants.

*John E. Fierro*, of Dodge City, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: This appeal involves two cases which were consolidated for trial in the district court and which have been consolidated in this court for purposes of appeal. Both cases grew out of a foreclosure action filed in Ford County by the First National Bank & Trust Company, Dodge City, Kansas. The facts, allegations and issues are hopelessly interwoven in the pleadings and briefs and will be presented together in this opinion.

Adrian Milford and Mary Milford, his wife, (hereafter referred to as the Milfords) were the owners of 480 acres of farm land in Ford County and 520 acres in Meade County. Their farming operation was financed by the First National Bank & Trust Company, Dodge City, Kansas (First National or the Bank) from 1977 to 1982. The Ford County property was subject to a first mortgage in favor of Connecticut Mutual Life Insurance Company, a second mortgage to the Small Business Administration, and a third held by First National. The Meade County property was encumbered with a first mortgage in favor of the Farmers Home Administration and a second mortgage to First National. The Bank also held a security interest in certain specified personal property of the Milfords, consisting primarily of farm machinery and equipment located in both counties, and the growing crops on both properties. The financing statement of the Bank was properly filed and no issue is made that it did not have a valid perfected security interest. Likewise, there is no controversy as to the validity of the mortgages on the real properties.

In 1982 the Milfords' financial position was deteriorating. They had recorded significant losses over the past several years and were behind in their payments to the Bank, which prompted it to encourage the Milfords to refinance and/or liquidate portions of the real estate to bring their debts into line. On April 2, 1982, Patrick Milford (Patrick), the eldest son of Adrian and Mary Milford, gave Adrian a check for $147,000. Adrian paid $100,000 of these proceeds to the Bank. The Bank then assigned its second mortgage on the Meade County real estate to Patrick. On April 22, 1982, the Milfords executed a note to Patrick for the $147,000. In addition, the Milfords entered into what they characterized as a "three-year farm lease," whereby Patrick would receive one-half of all crops from both farms. Under this "lease" Patrick was required to make payments on the Milfords' mortgages. This

transfer of a one-half interest in the Milfords' crops was done without the Bank's knowledge or consent.

No further payments were made by the Milfords or Patrick on the indebtedness to the Bank. On February 23, 1983, the Bank filed an action seeking to foreclose its security agreement and the Ford County real estate mortgage. On May 23, 1983, judgment for $266,131.75, with interest at 17 ¼% per annum, was entered against the Milfords foreclosing the real estate mortgage and security agreement. Thereafter an order of sale on the Ford County real estate was issued and the real property was sold to the Bank for $87,000 on July 27, 1983, leaving a sizeable deficiency judgment. On July 1, 1983, the court entered an order granting the Milfords a one-year right of redemption to begin July 27, 1983. On June 24, 1983, a special execution was issued to the sheriffs of Ford and Meade Counties against the tangible personal property described in the security agreement including the growing crops on both properties. At this time there was wheat, alfalfa and milo planted on the Milford farms. The wheat, which was nearly ready for cutting, was subject to PIK agreements with the federal government. On July 5, 1983, the Bank took possession of all the tangible personal property, which included the Milfords' farming equipment, and transported it to Dodge City where it was sold at public auction on August 5, 1983. During approximately the first three weeks of July, the crops on the Milfords' land were uncared for and the wheat was severely damaged, if not totally lost. At trial the Milfords claimed they were instructed by the executing sheriff, their attorney and officers of the Bank to leave the crops alone and sought damages by way of a setoff for the value of the crops which were damaged or perished.

On July 26, 1983, Patrick filed his action for wrongful execution against the Bank for damages for one-half of the growing crops on the Milford farms and for the wrongful execution and sale of two items of farm machinery which he alleged were his and which were sold by the Bank. He also sought punitive damages. The Bank filed a counterclaim seeking an accounting and damages for monies allegedly received by Patrick from crops sold in 1982, together with federal payments and PIK entitlements, all of which the Bank contended were subject to its security agreement with the Milfords. The Milfords' claim of a

setoff for the value of the destroyed crops and Patrick's claim for wrongful execution were consolidated for trial to the court. Following trial, the court rendered judgment for the Bank on the claims of the Milfords and Patrick and, in addition, granted the Bank a judgment against Patrick on its counterclaim. The Milfords and Patrick have appealed. Additional facts will be set forth as they become necessary in discussing the various issues on appeal.

On appeal the Milfords and Patrick have filed one brief covering numerous claims and issues which overlap, assert inconsistent claims to the same relief and, as stated by the trial judge, have presented to the court a "labyrinth of conflicting facts and legal theories." We will attempt to address the issues in the same order they have been presented to the court. On occasion when it is questionable as to which appellants are raising an issue, the Milfords and Patrick will be referred to collectively as the appellants.

The first issue is raised by Patrick wherein he contends that his failure to file a financing statement does not affect the validity of his claim to one-half of the growing crops. As a part of his loan to the Milfords, Patrick received, among other things, a promissory note for $147,000 together with a purported three-year farm lease on the Ford and Meade County farms. The lease, on a commonly used printed form, provides for Patrick to be the operator of the farms and for him to receive 50% of the proceeds from the crops. Strangely enough, the parties contend only one lease was executed but the exhibits introduced in evidence include two leases, one introduced by appellants and the other by appellee, dated the same date and executed on the same date before the same notary public. Neither appears to have been altered in any manner; however, the terms of one lease are more advantageous to Patrick than the terms of the other. The trial court was evidently of the opinion that as Patrick had not filed a financing statement, the lease which granted Patrick 50% of the proceeds from the crops did not transfer any interest to him. Whether the court meant that the lease agreement was void or that the 50% interest was inferior and subject to the prior perfected security interest of the Bank is not clear. We agree with Patrick that K.S.A. 84-9-311 allows the free alienability of a debtor's property; however, it remains subject to any preexisting

liens or security agreements. Regardless of the validity of the lease, the Bank, through its existing perfected security agreement, had a superior claim to the crops and the proceeds therefrom. While the lease agreement may have been effective between the Milfords and Patrick, it did not diminish the Bank's prior interest in the crops. K.S.A. 1985 Supp. 84-9-301 and 84-9-312. Issues of res judicata, collateral estoppel and fraud raised by the Bank need not be addressed in view of our determination that the Bank's interest was superior to that of Patrick.

The next issue raised is whether Patrick is entitled to recover for damage to his interest in the crops. He relies upon K.S.A. 84-9-112, which grants certain rights to the owner of collateral which is being foreclosed upon for the debt of a third party. The fallacy in the argument is that even under the most favorable of the two leases Patrick was not an owner but a lessee entitled to a share of the proceeds from the crops if, as and when there were any such proceeds available. As previously determined, such interest was subject to the prior security agreement of the Bank.

The third issue is whether the Bank breached its duty to care for the growing crops and its duty to act in a commercially reasonable manner. It is somewhat difficult to determine whether this issue is being raised by Patrick or by the Milfords. In either event, a recitation of additional facts becomes necessary at this point.

Following entry of the Bank's judgment against the Milfords on May 23, 1983, an order of sale for the Ford County real property was issued with the sale scheduled for July 27, 1983. On June 24, 1983, an execution was issued against the personal property and crops covered by the Bank's security agreement. The execution was served on June 27. The evidence was conflicting as to the directions given the Milfords by the officers levying the executions. The Meade County sheriff testified that he told the Milfords to stay away from the crops and that the Bank would be taking care of them. The Ford County officer denied giving any such instructions. It does appear that both officers only levied upon the wheat crop which was mature and almost ready for harvesting or swathing and that the Bank was not asserting a claim to the immature alfalfa and milo. The Milfords then contacted their attorney and were told to leave the crops alone. Appellants, in their brief, contend that the execution

had a memorandum attached which stated, "The Bank will be making the plans to harvest and store the crops." Specific references are made to the record where this "memo" may be found but no such document exists in the record before this court. On July 1, 1983, the Bank, in its case against the Milfords, sought and obtained an ex parte order restraining them from disposing of any collateral covered by the judgment foreclosing the Bank's security agreement. This order was obtained without adequate notice to the Milfords or their counsel and the motion was heard ex parte because the Bank's attorney wanted to go on vacation and was fearful the Milfords might convert some of the collateral or the proceeds therefrom to their own use. At the hearing on July 1, 1983, the president of the Bank testified that it was the intent of the Bank to take control of and harvest the wheat. At this time several hundred acres of PIK wheat were ready to be cut and the alfalfa and milo needed water, fertilizer and other care. In a separate order on July 1, 1983, the court established the Milfords' redemption period to be one year from July 27, 1983, the date of the scheduled real estate mortgage foreclosure sale. On July 5, 1983, the Bank took possession of the farming equipment and other property covered by its security agreement and subsequently sold it at auction. On July 15, 1983, the Bank, through its counsel, advised the Milfords to take care of the harvest and to look after the crops. At this time they had no equipment with which to do so, the wheat was already lost or damaged and the alfalfa and milo may have been damaged. Following the July 1, 1983, order establishing the Milfords' redemption period, any crops maturing prior to July 27, 1983, were subject to the Bank's security interest and the proceeds from their sale should be applied to the Bank's judgment. Crops maturing subsequent to July 27, 1983, would inure to the benefit of the Milfords. *First Federal Savings & Loan Ass'n v. Moulds*, 202 Kan. 557, 451 P.2d 215 (1969).

Under K.S.A. 84-9-207 a secured party is bound to "use reasonable care in the custody and preservation of collateral in his possession." When growing crops are the subject of the security agreement, the determination of who is responsible for their care and preservation is a question of fact. By its actions in the present case, the Bank exercised dominion and control over the mature crops sufficient to establish a duty on its part to use reasonable

care in preserving the wheat. The Bank had clearly indicated that it would be responsible for the care and cutting of the wheat which was ready for harvest. By the time the Bank requested the Milfords to resume responsibility for the crops, they had no machinery or equipment and presumably were unable to do so. Based upon the undisputed evidence, we find that the trial court erred in not granting a setoff to the Milfords for the value of the wheat from both farms which could have been harvested prior to July 27, 1983. The case must be remanded for a determination of such damages, if any.

Next, it is asserted that the executions issued by the Bank were unlawful. The appellants contend the execution against the crops was unlawful based upon *Isely Lumber Co. v. Kitch*, 123 Kan. 441, 256 Pac. 133 (1927), and also argued that the Bank wrongfully levied upon two items of machinery belonging to Patrick. In *Isley* the court held:

"Annual crops, which are the product of industry and care, are not, while growing and immature, such personal property as subjects them to attachment and sale on execution." Syl. ¶ 2.

*Isley* involved a judgment creditor who attempted to collect its judgment by seeking an execution on an immature wheat crop. The execution was levied in January, long before the wheat reached maturity, and part of which was growing upon the defendants' homestead. Additionally, the court pointed out that there was no voluntary security interest created by the defendant and the wheat crop had not been mortgaged to the plaintiff. *Isley* is clearly distinguishable, as are all of its progeny. See Shepard's Kansas Citations, Supreme Court Reports, p. 376 (1986). We have found no cases, and none have been cited by counsel, that would indicate that a security interest voluntarily entered into by the debtor in a mature crop, ready for harvest, may not be levied upon in an action foreclosing the security interest. The execution upon the mature wheat crop under the facts of this case, was not unlawful.

Patrick also contends that he was the owner of a 1978 New Holland cutter and a Richardson dump wagon which were taken and sold by the Bank in its foreclosure of the security agreement covering the Milfords' farm equipment. The Milfords were in possession of the two items, they had been consistently listed on numerous security agreements executed by the Milfords to the

Bank, and Patrick had full knowledge of the pending proceedings and made no attempt to assert his claimed interest even though he had at least a month in which to do so. The contention of Patrick lacks merit.

The fifth issue on appeal is whether the district court had jurisdiction to award proceeds and entitlements from the government farm program to the Bank. The question of a secured creditor's rights to federal agricultural entitlements has been addressed by a number of courts. While the issue usually involves priority to the entitlement proceeds, it appears well established that a government entitlement is capable of being dealt with by the court in the setting of a secured transaction. See *Pombo v. Ulrich*, 495 F.2d 511 (9th Cir. 1974); *In Re Preisser*, 33 Bankr. 65 (Bankr. D. Colo. 1983); *In re Nivens*, 22 Bankr. 287 (Bankr. N.D. Tex. 1982). Agricultural entitlement payments made to a debtor are proceeds of the planted crop under the Uniform Commercial Code and are subject to a creditor's security interest in the crops out of which the payments arose. *In re Kruse*, 35 Bankr. 958 (Bankr. D. Kan. 1983). The trial court enjoys the same jurisdiction over agricultural entitlement payments as it does any other collateral.

Next, the appellants question the trial court's determination that as the Milfords retained control of the crops, the Bank had no liability for the lost crops. This issue is addressed in the context of the requirement that appellants were required to mitigate their damages. The law in Kansas requires a party to make reasonable efforts to mitigate damages, and recovery will not be allowed for damages that a party should have foreseen and could have avoided by reasonable effort without undue risk, expense or humiliation. *Osborn v. Grego*, 226 Kan. 212, 596 P.2d 1233 (1979); *Lines v. City of Topeka*, 223 Kan. 772, 577 P.2d 42 (1978); *K. P. Rly. Co. v. Mihlman*, 17 Kan. 224 (1876). A corollary to the general rule is that damages are not regarded as avoidable when one party has acted to prevent the other party from taking reasonable steps to avoid them. *Theis v. du Pont, Glore Forgan Inc.*, 212 Kan. 301, 510 P.2d 1212 (1973).

In the present case it would appear that any duty the Milfords had to mitigate the damage to the crops is negated by the Bank's assertion of control over the crops. Considering that the Bank had not only asserted control over the crops but had also taken

possession of the Milfords' equipment, the question of whether the Milfords could reasonably have taken any steps after July 15, 1983, to salvage any portion of the crops is an issue to be determined on remand.

The seventh issue is Patrick's claim that the Bank failed to prove its counterclaim. On April 24, 1984, the Bank filed a counterclaim against Patrick seeking to recover money Patrick had received from the 1982 crops, PIK entitlements and pasture rent. In its judgment the trial court found for the Bank on its counterclaim and ordered Patrick to account. This was clearly a factual issue determined adversely to Patrick and supported by substantial competent evidence.

Next, it is contended by Patrick that the trial court erred in allowing the Bank to file its counterclaim out of time and only one day before trial. K.S.A. 60-213 requires that a compulsory counterclaim be pled, but also allows a late filing with leave of the court. K.S.A. 60-215(b) allows issues to be considered that are not explicitly set forth in the pleadings. In McAlister v. Atlantic Richfield Co., 233 Kan. 252, Syl. ¶ 11, 662 P.2d 1203 (1983), the court stated that even where leave of the court is required to amend a pleading, leave shall be freely given when justice so requires. The court went on to note the trial court has wide latitude and discretion in permitting or refusing amendments of pleadings in the interest of justice and absent a clear abuse of discretion the trial court's order will not be disturbed on appeal.

In the present case, the plaintiff makes no allegation of prejudice resulting from the out-of-time filing of the counterclaim. It must have been obvious to plaintiff's counsel during the depositions that were taken that the Bank was seeking to recover money which Patrick allegedly improperly received. We cannot say the trial court abused its discretion by allowing the defendant's counterclaim to be filed out of time.

The ninth issue raised by Patrick is that by way of his $147,000 loan to his father he attained a superior status with respect to the collateral than that of the Bank, and that the Bank subordinated its interest in the collateral to that of Patrick. At trial Adrian Milford testified that he notified the Bank of his son's one-half interest in the growing crops at the time he paid the $100,000 and the Bank assigned its mortgage on the Meade County land to Patrick. Larry Heyka, president of the Bank, testified he never

discussed any transfer of a partial crop interest to Patrick. Heyka contended the first time he became aware of Patrick's alleged interest was on December 2, 1982. It is also asserted that the language of the last security agreement shows an intent by the Bank to recognize Patrick's claim as superior. The issue appears to have been one of fact which was resolved by the trial court in favor of the Bank. When the trial court makes findings of fact, an appellate court is confined to determining whether the findings are supported by substantial competent evidence. *Woods v. Midwest Conveyor Co.*, 236 Kan. 734, 697 P.2d 52 (1985). In the present case there is adequate testimony to support the trial court's findings.

The judgment in the case of Patrick Milford against the Bank is affirmed. The judgment in the case of the Bank against Adrian and Mary Milford is affirmed in part and reversed in part and that case is remanded to the trial court with directions to determine the damages, if any, suffered by the Milfords by reason of the Bank's assertion of control over the wheat crop and its concurrent failure to care for the crop.